Number 20-2686, United States v. Dunham, Mr. Hopwood and Ms. Hanson-Young. And I understand we're here via Zoom. Can you hear us? I can hear you, Judge Ambrose, and may it please the Court. My name is Sean Hopwood. I represent Appellant David Dunham, and I request three minutes for rebuttal. That's fine. Attorney Michael McAdams provided regulatory advice to David Dunham regarding renewable identification numbers and an IRS audit, the very issue the government later criminally investigated. McAdams worked for Holland & Knight, which also employed John Brownlee, who was Dunham's defense counsel. Can I just ask you a question at the outset, if I may ask a question at the outset? So you have McAdams giving advice to Dunham, and then later on, the Holland & Knight attorney, Brownlee, is giving advice with regard to a matter. Has there ever been determined that there was a conflict with McAdams giving advice temporarily before and Brownlee giving advice later on when there was a criminal investigation? Yes, and under the government's view, there was no conflict because, in their view, Dunham didn't directly implicate McAdams, and unless he did, there was no conflict. And you're saying, what is the conflict? The conflict is that there could be a significant risk that the representation of Dunham was impacted by Brownlee's desire to protect McAdams and Holland & Knight here. That's a potential conflict, not an actual conflict, right? Well, no, if there is a significant risk, that's all that's needed for the conflict. And I can give you just one example of how this conflict could have arose in the pretrial circumstances. Any defense lawyer in John Brownlee's position, any defense lawyer worth his salt, would have advised Dunham prior to waiving his rights and prior to entering into proper statements that, to the extent he could, he should have relied on McAdams' advice in those proper statements. That's a pretty frequent defense in these white-collar cases. And if Brownlee did not provide that advice and did not provide Dunham with the knowledge that there was a conflict there, that would have materially impacted and made his decision to waive his rights under Rule 11F and 410, unknowing and unintelligent. The government says that there was no conflict here because, again, in their view, Dunham didn't directly implicate McAdams. And then they say at trial he did not implicate McAdams. But that is wrong as a matter of state law and even under this court's jurisprudence. Under state law, the conflict exists if there's a significant risk that the defendant's representation will be limited, not whether Dunham had to directly implicate McAdams in wrongdoing. In fact, this court's case in Zep says that a court can find a conflict of interest even when there is no direct evidence of wrongdoing by the lawyer who provided the advice. And two, Dunham did say at testimony that he did rely on McAdams' advice for several of these regulatory issues that were at issue during the trial. And I refer the court to sealed appendix pages 136 to 141 and page 157. And, of course, the trial was about determining Dunham's guilt or innocence and was not about what advice he received from Brownlee or how that advice and that conflict impacted his decisions at the proper sessions. So the trial testimony here stands as a really poor substitute for an evidentiary hearing. Did Dunham try to have McAdams testify at trial that McAdams gave advice that Dunham followed beforehand? No, no, and that gets to the prejudice. It's hard for me to overemphasize how much this conflict prejudiced the trial. The threat of the government bringing in those proper sessions would have impacted a whole lot of trial strategy and could have impacted how Dunham framed his testimony because the defense was worried about those proper statements coming in. They ultimately did. Pieces of them came into the evidence at the trial. And Special Agent Flick was even allowed to testify at the trial about how Dunham had entered into plea negotiations with the government. And that would have been damning evidence before the jury. Didn't Dunham himself have all the information he needed to determine if there was a potential conflict of interest? He knew McAdams and Brownlee worked at the same firm. He did, but he did not know what a conflict of interest was or that this could impact his representation. And I think the best proof of the conflict here is that when the government finally calls attention to this, during the third proper session, Holland and Knight reevaluates whether there was a conflict of interest. And Dunham testified at trial that Brownlee came to him and said, hey, listen, I have to withdraw as counsel. Meaning Holland and Knight thought that the conflict was so bad that at that point it wasn't even waivable. And so, you know. Was there testimony to that effect or are you drawing that inference? Because if you're just drawing the inference, one could equally draw the inference that Holland and Knight thought that it wasn't worth even skating anywhere close to the edge and it's better to withdraw. It doesn't necessarily follow that Holland and Knight had concluded that there was a true conflict, does it? No, they did not have to conclude that it was a true conflict. And the testimony for that is on sealed appendix page 179. But they certainly thought that at that point there was a big enough issue that Brownlee could not continue with counsel. Which is surprising given that they would have, you know, tried to come up with a conflict resolution prior to representing Mr. Dunham and prior to him waiving his protections under Rule 11F and 410 and walking into three proper sessions. So let me just walk through this. Like what exactly is the government supposed to do when they see, you know, when they see a situation like this? Some of these conflicts can be waived, some maybe not. So is the government supposed to go into an inquiry into, for instance, Dunham's relationship with McAdams, Dunham's relationship with Brownlee? Well, I mean, what exactly? I mean, that has maybe its own issues, right? Like how much of it are you supposed to say, hey, do you have any conflicts? Have you waived any conflicts? How do you resolve any of these conflicts? Like, you know, that's kind of strange. You know, that's kind of a strange dynamic in its own way, wouldn't you say? I agree, Judge Phipps. And I would say our first line of defense here is that the waiver of Rule 11F and 410 was not knowing. And that's why an evidentiary hearing was required. But as to the outrageous conduct, the government didn't have a duty to do anything except for not exploit the conflict that they knew about. And maybe the very least what they could have done was gone to John Brownlee and said, hey, listen, there could be a very clear conflict of interest here, depending on how you advise your client, given that your colleague advised Dunham on the very issues that the government is now investigating. Can I just tease that out, though? Because at one level, that puts quite a big burden on a government. If a prosecutor realizes that a criminal defense attorney is ineffective in some way, they fall asleep during cross-examination, or, you know, just pick classic ineffectiveness, you know, that sort of stuff. Are we saying, gee, you know, it would be outrageous for the prosecutor not to turn and wake up the sleeping criminal defense attorney because they would be exploiting the ineffectiveness of counsel? I mean, at one level, isn't it kind of the same thing here, too? What duty does the government really have in this space to kind of say, hey, something might be going wrong on your end, but we're going to intervene to make sure that it's not that wrong? I don't think in order to grant us an evidentiary hearing on this, Judge Phipps, you have to decide any of that. And what I'd say is, at the very least, the government could not try to extrapolate a waiver from the defendant and then walk into three proffer sessions and squeeze whatever information they could before they finally say, oh, maybe there's a problem here. At the very least, they can't do that, whatever a duty they have. What about the sleeping defense attorney? Government have an obligation to wake up a defense attorney who's sleeping during trial? No, and under that line of cases, no, the government wouldn't. But there is a line of cases that say when the government's aware of a serious conflict, they do have a duty to bring it to the attention of the court once charges have been filed. And, again, I don't think you have to require a duty here. I think what you can say is, at the very least, the government couldn't just knowingly exploit this. And I don't think the government just was unaware that there was a problem here until that third proffer session. That's all the more reason for why the judge, the district court, should have required an evidentiary hearing here to know, to learn about, and determine what the government lawyers knew. The government also is just simply wrong that there was no conflict, substantial, actual, or potential conflict, until Dunham directly implicates McAdams. That's just not true as a matter of state law or under this court's jurisprudence in the Sixth Amendment arena. And so, you know, the government had everything it needed to know that there was a serious problem here, and it waited until the very end, and after it had exploited that to say something. And under those circumstances, which I take it that the court is hesitant to grant any due process outrageous claim, but this case is much different than the bulk of the claims that's been before the court before, which is this is not a failed entrapment defense disguised as a due process claim. This is not a case that was on the periphery of whether there was a conflict or not. This was a clear problem that the government knew about, and it exploited it to great effect. And the prejudice here, much more substantial than in any of the other cases that this court has faced before. But again, our primary line of defense was that the district court should have had an evidentiary hearing and at least inquired as to what David Dunham knew before he waived his protections under Rule 11F and Rule of Evidence 410. Exactly how do Dunham's and McAdams' interests diverge? Well, I think they diverge in that Brownlee or Dunham and McAdams. Dunham could have relied on some of McAdams' advice on some of these regulatory issues. McAdams was providing advice on regulatory issues that were the same issues that were at issue with the government's federal criminal investigation. And so, you know, there could have been an advice of counsel defense. McAdams could have been a witness for the government or McAdams could have been a witness for the defense. And so there were diverging interests. And I see that. How could how could McAdams have been a witness for the government? Well, we're going to play some crime fraud exception to the attorney client communication. Or what do you think? Well, the government at the pretrial stage alleged that McAdams was not acting as an attorney when he provided that advice and was only a consultant. And so there was a potential they could have called him and litigated that issue out. So if he wasn't acting as an attorney in that capacity, what I mean, it seems that the conflict of interest rules apply to attorneys in their capacity as attorneys, not in their capacity as, you know, sometimes corporate attorneys, transactional attorneys say, oh, by the way, you've got to get a better amortization schedule or you've got to get this. And that's not attorney client privilege. That's just business info. But but I don't think that the conflict rules apply when you're in that business info space. Regardless of whether McAdams was an attorney or not, the conflict was having Brownlee represent Dunham. And so if McAdams was a consultant or an attorney when he provided that advice, Brownlee would have had an incentive to protect him and the firm's name and reputation while representing Dunham. And that's where the conflict arises here. Any sort of advice that Brownlee did not provide Mr. Dunham that was impacted by the fact that the person who had provided regulatory advice was his colleague at the same firm. That is the conflict. That is a significant risk that the representation would be materially limited. Just thinking about this from from from an institutional point of view, you've got the law firm. Which may be have some tension as to whether it has a conflict. And then you have the government saying, well, you know, in effect, he shows up. What evidence is there that the government actively encouraged or exploited the potential conflict of interest rather than just merely turning a blind eye to it? Well, we don't have the evidence, Your Honor, because the court, the district court below, didn't require an evidentiary hearing to know about what the government did know versus what it didn't. We do know that the same agents that were in the proper sessions were at David Dunham's business the day it was raided. They knew McAdams had provided advice. They knew that Dunham called McAdams first and that they knew McAdams was in the same law firm as John Brownlee. Dave Dunham to no longer speak with the agents that day. But even if you're correct, at least had enough knowledge that there was a problem. Even if you're correct, how is that outrageous government conduct that we've only held once in the twig case causes a conviction to be overturned? Well, say at the evidentiary hearing, the government lawyers say, well, we were aware that there was a significant risk of a conflict and we were aware that this could impact the representation. But we decided we were just going to let Dave Dunham waive his rights and give us all the information we needed until he directly implicates McAdams. And again, that's wrong. The government's wrong as a matter of law. But had they done that, that would be outrageous. They knowingly knew there was a significant risk of a conflict and exploited it to great benefit. But at the end of the day, you don't have any facts to sink your teeth into. And your response to that is, well, that's why we wanted an evidentiary hearing. That's correct. And especially on the waiver issue. I mean, it would have been very hard for Dunham to know whether or not to knowingly waive his rights when he has conflicted counsel with him at the waiver stage and during three proper sessions. All right. Thank you. We'll get you back on rebuttal and we'll hear from Miss Hanson-Young. Good afternoon, Your Honors. May it please the Court, my name is Tecla Hanson-Young and I represent the United States. I'd like to first start with Dunham's argument that an evidentiary hearing is required both on his outrageous misconduct claim and on the question of whether the proper session or the proper agreement was signed knowingly. I'm sorry to interrupt you, but it looks like Mr. Hopwood has left us and I want to make sure that he gets it. Oh, OK. You just went off camera. OK, no problem. I'm sorry. I apologize, Miss Hanson-Young. That's fine. On the question of whether there is a need for an evidentiary hearing on the claim of outrageous misconduct, there is simply no need for such a hearing because the claim fails as a matter of law under this Court's precedent. As Your Honors noted, this Court has found no instance of outrageous misconduct aside from the Twigg case, which involved two factors, the government's creation of the crime and the government's extreme participation in the crime. And the two cases that come closest to the situation are Voight and Cossack. And in both of those cases, the government knew of the conflict and actively exploited it. In Voight, the defendant's attorney was actually working as an informant for the government and providing evidence to the government. And in Cossack, the defendant's attorney was under investigation and the defendant did not know and followed the attorney's advice to turn over documents. You say you didn't know of the conflict of interest or the government didn't know until the third proffer meeting, but it did know that McAdams gave regulatory advice to Dunham and it did know that McAdams and Brownlee belonged to the same law firm. Does that raise at least two red flags? It appears as though Dunham mentioned to the government agents that he had obtained regulatory advice from McAdams, but there's no information in the reports of those investigations or those interviews that McAdams worked at the same law firm as Brownlee. And so it is possible that the government did know that McAdams had provided Dunham with advice, but that alone is not enough to create a conflict here because that by itself doesn't create a significant risk that Brownlee's representation would be materially limited by any obligations to McAdams or to his law firm. For Brownlee's representation to have been materially limited, there would have had to be some suggestion that Dunham was planning on relying on using the reliance defense at trial potentially and might be called as a witness. But even in that situation, it's hard to know how Brownlee's representation would have been materially limited. Really what it would have to have been would have been Dunham alleging that McAdams gave him illegal advice or could have been a potential suspect. And then in that situation, it's possible that Brownlee would have wanted to cover up what McAdams had done. But then in that situation, it makes no sense for Brownlee to have encouraged Dunham to participate in the proffers. And if you actually look at the proffer agreement on the first page, it shows that it's a letter from the government to Dunham, to Dunham's attorney, that says, you indicated that your client Dunham wanted to meet with us during these proffer sessions. So the government didn't even ask or encourage Brownlee. This gets to the second prong. There was no conflict, but even if you assume there was a conflict, which is what the district court did, Dunham can't show that the government actively exploited the conflict to deliberately intrude on that attorney-client relationship. The only evidence in the record is that proffer agreement, which says that Dunham wanted to meet with the government. And there's good reasons why defendants want to participate in proffer sessions. Dunham's response to their inability to show that is that they were deprived of a hearing, and that's the whole point of the hearing is for them to try to marshal the evidence to show that. And I have two answers to that, Your Honor. My first answer is that under this court's decision in Voight, a defendant has to show more than mere allegations or conjecture about these prongs, satisfying these prongs. There has to be some actual concrete allegations. What would that have looked like in this case? Can you give me a counterfactual that would have triggered that requirement? Sure. Dunham could have said that Brownlee pressured him into attending the proffer sessions, or Dunham could have said that Brownlee asked him not to mention any advice that McAdams gave or to change the nature of the advice that McAdams gave. So it would have all depended on Dunham's allegations of what happened. But Dunham hasn't made any of those allegations throughout the entire trial and in the proffer sessions. He simply said he obtained advice. And that by itself, without more, isn't enough to create a significant risk that Brownlee would have been materially limited in his representation. So with that factor being unable to be met, there's no need for an evidentiary hearing. And the other reason, going back to my first point, is that the claim of outrageous misconduct fails as a matter of law, because even if you assume there was a conflict and even if you assume the government, at most, asked Dunham to participate in these proffer sessions, thereby, you know, allegedly exploiting the conflict, that wouldn't be enough under this court's decision in Boyd v. Cossack, where this court held it was not outrageous for the government to actively receive information that implicated a defendant from that defendant's attorney. So the claim just simply fails. The outrageous misconduct doctrine doesn't apply here. And therefore, there's no need for an evidentiary hearing. Is the government asking for a bright-line rule that as long as the government – I know you don't concede there was misconduct, but assume for a minute there was – Are you asking for a bright-line rule that as long as the government misconduct occurred after and independent of the defendant's crimes, that there can be no valid constitutional claim? If the court were inclined to rule that way, I think it would certainly be consistent with this court's decisions and the decisions of other courts of appeals. I don't think we need that ruling here. I think we can simply say that based on the facts that are alleged by Dunham, he cannot state a claim under Twigg or under Boyd or Cossack. And so, you know, I think Your Honor is correct in that under Twigg, the defendant would have to show that the government had both created the crime and actively participated in the crime. But I don't think the court needs to reach that ruling or include that in its decision in order to affirm Dunham's conviction here. Did the government ever investigate McAdams? As far as I know, no. My sense is that McAdams was potentially considered as a witness by Dunham. He raised the specter of the reliance on counsel defense numerous times, both before trial and I think even during trial. But he never actually made that argument. And the government did not call McAdams as a witness. I'd like to address the prejudice arguments that Dunham has made, which provides an independent reason for this court to reject his claims. Dunham cites to several examples of the use of the proper sessions in his reply brief. But in all of those examples, there are ample other instances of evidence and testimony that were presented at trial that proved the points that would have, that were referenced in the proper statements. There were, you know, the government had been investigating Dunham since 2009, which was years before the proper. And specifically, there was testimony from Dunham's employees stating that they were directed to change records in preparation for audits and to audits both by private companies, by shell trading and by the government. There was testimony from government investigators that Dunham had changed the records and that had been determined by going back through the records using something called audit trail, which shows that the records had been changed and when they were changed. There was testimony from his co-defendant, Tommaso, basically stating that they falsely claimed credits and that they were generating credits on material that didn't exist, on material that wasn't eligible. There was testimony from the shell auditor, which showed that Dunham had actually falsified records to her in an attempt to cover up what he was doing. And then there were, there was also testimony from several of Dunham's customers, including a company called, including representatives of a company called Hero and a company, and a company referred to as Amenico. And both of those witnesses testified that Dunham had sold the material feedstock, which wasn't eligible for the credits and represented to them that he was not claiming credits on that material. And then, in fact, the records actually showed that he was claiming credits on that material. So, all of the instances in which the proffer was referenced and in which Dunham alleges he was prejudiced by the use of the proffer were actually supported by ample other evidence. And so, there's no prejudice. Can I just, you know, I'm sorry for interrupting, but, you know, the nature of this proffer and the nature of the conflict is kind of counterintuitive to me in the sense of if an attorney has a conflict, potential conflict or significant risk of material limitation on representation, let's just use the words that Pennsylvania uses, it just strikes me as very weird to have that attorney then say, let's go do some proffer sessions. You're absolutely right. I don't, I don't get how in the world, if you say, you know, I don't want, I don't want my law firm to look bad. I don't want these other things to happen. I don't want to bring embarrassment. I don't want anything else. You know what we should do? Let's go do some proffer sessions with the government. I just do not get how doing a proffer session is in any way indicative. It almost counterindicates that there's a material limitation. I mean, maybe this is a point more to your friend on the other side, but I don't get that. I struggle with that as well, Your Honor. I don't understand the theory of the conflict. You know, I think that to complete the story, there would have had to have been an allegation on the part of Dunham where he said, Brownlee advised me to tell the government prosecutors that I was solely responsible and that I obtained no advice from McAdams. Something along those lines. I mean, there is some potential theory of a conflict here, but we don't have the rest of the pieces and of the allegations. And without those allegations ever having been made, there is no potential conflict. I have no further questions. Anybody wants to have any questions? Thank you very much. And Mr. Hopwood, back on rebuttal. Thank you. Thank you. Thank you, Your Honor. Well, I want to address Judge Phipps' point first, which is there are several ways a conflict could have existed. The government just admits today that McAdams could have been a potential witness. Had Brownlee, you know, Brownlee could have told Dunham, diminish the advice you received from McAdams because if you don't and the government calls McAdams, Brownlee would not be able to continue with the representation of David Dunham. It could have been the case that Brownlee did not tell Dave Dunham to rely on McAdams' advice. Even though, even if there was not an advice of counsel to found, it still would have looked good to the government if Dave Dunham had committed some of these actions based on the advice of counsel. That would have been very relevant to know. I guess my thought is, where is the outrageousness? If there is a conflict, it strikes me as strange for the government to say, you know, maybe there's a conflict, but they're showing up here with a proffer, and they want to tell us everything. The fact that they're showing up, I think, really minimizes any significant risk of conflict. I think it's a reasonable assumption on the government's behalf that this is kind of a conflict-free space as opposed to thinking about hypothetical upon hypothetical in which maybe there could be a conflict. I mean, I think everyone agrees maybe there could be. There could have been certain communications that would have made this a real, real, real big problem. But sooner or later, there's a risk assessment. Not only is the risk assessment high, significant risk, it's measured, it's coupled with outrageous government condom. So even if the government got the significant risk assessment wrong, did it do so in an outrageous way? And that's a tall task. Well, then my argument, Judge Phipps, would be at the end of the day, Dave Dunham still could not have knowingly waived his protections under Rule 11F and 410 because unless he knew that he was dealing with conflicted counsel and unless he received the proper advice, it would have been hard for him to make a knowing and intelligent decision to waive those rights and walk into three proper sessions with conflicted counsel. And you're right, there are all sorts of ways this conflict could have manifested itself, but we don't know that because the district court just assumed that no matter what set of facts Dunham proved at a hearing, it would not amount to an unknowing and unintelligent waiver under Rule 11F and Rule 410, and that's just wrong as a matter of law. You know, there are several cases out there where defendants have pled guilty and learned that they had conflicted counsel and were able to withdraw their guilty pleas as unknowing and involuntary, and this is no different than those situations. But the government's response, Mr. Hopwood, is that while that's theoretically possible, it's incumbent upon Mr. Dunham to come forward as a central participant in this whole scenario. It's incumbent upon him to make a proffer, so to speak. He's got to come forward with some evidence at his disposal. Otherwise, it's just a speculative fishing expedition, and if it's only a speculative fishing expedition, it's almost impossible for us to conclude that the district court abused its discretion. So what's your response to the government's point that to put it in a colloquial way, Mr. Dunham needed to give the district court something to chew on that would warrant an evidentiary hearing? Or are you asking for a bright-line rule from your perspective that there always has to be an evidentiary hearing even if the defendant has nothing to offer? No, I think Dave Dunham did that by saying that there was a conflict of interest with his prior counsel who by that point had withdrawn as counsel in the case by the time the district court decided the evidentiary hearing. Remember, this issue was decided at the motion in limine and not at the motion to dismiss, and Dunham didn't have to show outrageous conduct in order to show that that waiver was not knowing. What he said was there is a conflict of interest here, an actual conflict of interest, and a hearing should be held, and the district court seemed to acknowledge that, but said that under no set of circumstances can Dunham show that this waiver would be unknowing, and that's at Appendix 19, and that's simply incorrect. Are you sure that the request for the hearing was that specific? When I looked at the record, I thought that the request for hearing was at best ambiguous and maybe about other matters and not this. Well, he requested an evidentiary hearing in the motion to dismiss and argued that there was prejudice and that the prejudice involved that waiver. And then when the government files the motion in limine, he asked the court to receive evidence. He refers back and cross-references the motion to dismiss that asked for an evidentiary hearing, and then he asked the district court to reconsider that motion. So that certainly would have put the court on notice that he was requesting an evidentiary hearing. But for this individual, I mean, it's not really developed what he's doing. He requests the hearing, doesn't it? I mean, what you explained in detail just now is very different than what was in any of those filings. And so, you know, we do have waiver rules that say if you want something, you've got to develop the argument, you've got to develop all of these other things. And I'm not sure I see that in the record. I see a request for an evidentiary hearing, but I don't know that it's tethered to all of the, you know, attendant facts and points that you would need to say, yes, the district court was squarely on notice and this was squarely raised. Well, in his response to the motion in limine where this waiver issue comes up, he refers and cross-references the motion to dismiss that asked for a hearing. He asked the court to receive evidence. And then he asked the court not just to deny the government's motion in limine, but to reconsider the motion to dismiss in which he had previously requested an evidentiary hearing. Does that reply, right? That's a reply or is that the opposition? That was a response to the government's motion in limine. That's at Appendix 405. And so the district court seemed to acknowledge that a hearing was requested because it said there are no set of circumstances Dunham can prove to show that the waiver was unknowing because it has nothing to do with whether Dunham was going to be untruthful during the proper sessions. But that was not the right question to ask. The right question was, was there an actual conflict of interest that adversely affected Dunham's decision to enter into that waiver knowingly and intelligently? Question, what happens if we grant the relief you're asking for? Could the government just issue a new indictment? Well, it depends on what relief we're talking about, Your Honor. If it's at this point, the only relief we're asking for is for this to be remanded back for an evidentiary hearing to learn all of these facts. Assuming we could prove the due process violation, the remedy could be either dismissal or it could be the same remedy we would ask for on the waiver issue, which is that there is a new trial granted. Only this time, the government doesn't get to hold these proper sessions and the threat of bringing those into the trial. Well, even if he didn't, I mean, it just goes back almost to the beginning. If Dunham didn't attend the proper sessions, couldn't the government have elicited the same evidence or same testimony at trial and cross-examination? Yes, but the proper statements would not have come in. And Special Agent Flick would not have testified at the trial that the defendant who's proclaiming his innocence was entering into plea negotiations with the government. That would have been damning evidence at the trial. And those sorts of things impacted all sorts of tactical decisions with the defense at trial. And they would not be implicated if the government didn't have the threat of those proper sessions at a second trial. All right. Thank you very much. Thank you to both counsel for very well presented arguments. I would ask a transcript be prepared of this oral argument and split the cost 50-50. But again, thank you for being with us today, and we'll recess the court. Please rise.